# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:14CR409 |
| | ) | |
| V. | ) | |
| | ) | |
| SHANE SEIZYS, EMMANUEL CHAPLAIN, DILANG DAT, THOMAS JONES-ROSS, | ) ) ) | FINDINGS AND RECOMMENDATION |
| | ) | |
| Defendants. | ) | |
| | ) | |

The defendants in this action are charged in a multi-count indictment (filing 1) with charges stemming from robberies that occurred in June and July, 2014.  This case is presently before the Court upon motions to suppress filed by Defendants Emmanuel Chaplain ("Chaplain") (filing 80), Shane Seizys ("Seizys") (filing 83) and Thomas Jones-Ross ("Jones-Ross") (filing 89).  An evidentiary hearing on the motions was held before the undersigned on June 2, 2015.

Having heard testimony and reviewed the evidence on this matter, and for the reasons explained below, the undersigned will recommend to Chief United States Judge Laurie Smith Camp that the motions be denied in their entirety.

## FACTS

On June 23, 2014, a robbery occurred at the Kum & Go convenience store located at 1010 South 154th Street in Omaha, Nebraska.  Witnesses to the robbery described the suspects as two, dark-skinned black males.  Witnesses also indicated that the suspects wore dark hooded sweatshirts and one suspect had a bandana over his face.  The suspects were seen leaving in a silver or white sedan.

A few minutes after the Kum & Go was robbed, police were dispatched to the area

of 90th and Maple Streets in Omaha regarding a silver Oldsmobile Aurora stalled in traffic. Although there were no occupants of the vehicle present when police arrived at the scene, Officer Chad Wiebers had driven by the Oldsmobile earlier while on his way to another call. At that time, Officer Wiebers observed several occupants of the vehicle and made eye contact with the driver.

Law enforcement discovered that the Oldsmobile was registered to Tamiko Jones, Defendant Jones-Ross's mother. Tamiko Jones was interviewed by police and informed officers that Jones-Ross was previously in possession of the vehicle. A photo lineup that included Jones-Ross's picture was shown to Officer Wiebers. The line-up included photographs of six black males, with features similar to those of Jones-Ross. Officer Wiebers was able to identify Jones-Ross as the driver of the Oldsmobile.

On July 16, 2014, the Game Stop located at 9959 Redick Circle in Omaha, Nebraska was robbed. Video games were taken in that robbery. Approximately twenty minutes later, the Kentucky Fried Chicken ("KFC") located at 7601 North 30th Street in Omaha was robbed. Omaha Police Officer Patrick Dempsey received a call to respond to the scene of the KFC robbery at 6:58 p.m. Officer Dempsey testified at the hearing that he arrived on the scene less than 45 seconds after the call. Upon his arrival, a KFC employee told him that the restaurant had just been robbed by two black men and that they had run eastbound. The witness stated that she observed the suspects changing their shirts near a white Ford Mustang that was parked approximately a block away from the KFC. Officer Dempsey testified that he went to the area of the Mustang and was approached by another individual who stated that the men continued eastbound and possibly southbound. Officer Dempsey transmitted this information over his police radio.

Officer Chad Frodyma and his partner, Officer Petrick, heard Officer Dempsey's radio call. Officer Frodyma testified that he recalled hearing over the radio that three black males, two of whom appeared to be of Sudanese descent and two wearing white t-shirts, had run from the area. Officer Dempsey does not recall providing a detailed description of the suspects over the radio.

Officer Frodyma stated that he and Officer Petrick arrived in the area of the KFC

2

approximately a minute to a minute and a half after Dempsey's radio call. Officer Frodyma then heard a second radio call indicating that a witness saw the parties leave a car parked on 29th Street and head east and to the south. Officers Frodyma and Petrick started toward that area. Approximately three to four blocks away from the KFC, Officers Frodyma and Petrick observed three black males, two of whom appeared to be of Sudanese descent and one was wearing a white t-shirt. Officer Frodyma testified that he observed the individuals within three minutes of the time the initial call came out. The officers exited their vehicle and detained two of the men, who were later identified as Defendants Seizys and Dilang Dat ("Dat"). Dat was pat down, and officers located a key that matched the Mustang in his pocket. The third-man, later identified as Defendant Chaplin, fled upon seeing the officers, but was detained a short time later.

Police Sergeant Russell Petersen also responded to the scene of the KFC robbery and spoke to employees. Sergeant Petersen testified that he was told by witnesses that some of the suspects were wearing gray sweatshirts and at least one had a red bandana. Sergeant Petersen stated that, without entering, looked into the Mustang and could see a gray sweatshirt, red bandana and video games in plain view.

The officers decided that a "show-up" would be done where witnesses would view the suspects and see if an identification could be made. Seizys, Chaplain and Dat were all transported to the parking lot of the KFC, and then separated and placed in separate police cruisers. Witnesses were individually brought to the scene and placed in an unmarked police cruiser. One at a time, each suspect, cuffed and accompanied by armed officers, stepped out of a police cruiser and presented to each individual witness for identification. Two witnesses who were behind the counter when the robbery occurred, William Booth ("Booth") and Audrey Chaney ("Chaney"), positively identified Seizys as a participant in the robbery. Chaney described the first suspect as a dark complected black male, six feet tall, with a dark hooded sweatshirt and lighter colored pants. She described the second suspect as a lighter complected black male, with a red bandana, gray sweatshirt and dark jeans. Booth described one suspect as wearing a red bandana with a gray hooded sweatshirt, light complected in his mid-20's. He described another suspect as being a dark complected black man, six feet tall, slim build, wearing a blue bandana and white pants. When Seizys presented to Booth for identification, Booth said he was certain that Seizys was one of the robbers. Three other

3

witnesses who participated in the show-up were unable to identify anyone. The show-up started at 8:53 p.m.

The Mustang was subsequently seized by police. Police found a fictitious license plate taped to the rear of the Mustang. It covered a plate belonging to Edward Chaplain, Defendant Chaplain's brother. The vehicle was searched before it was towed to the Omaha Police Impound Lot. The following day, police asked Edward Chaplain for permission to search the Mustang. Edward Chaplain denied consent. Consequently, the police applied for, and received, a search warrant. The application for the search warrant did not disclose to the issuing judge that police searched the vehicle at the scene.

After Seizys was arrested, further investigation led officers to discover that he was on parole and wearing an electronic tracker on his ankle.

## DISCUSSION

Chaplain has moved to suppress all evidence obtained from the Mustang on the basis that the vehicle was searched in violation of his Fourth Amendment rights. Chaplain also seemingly asserts that there was no probable cause for his arrest.

Similarly, Seizys claims that there was no probable cause for his arrest, the Oldsmobile and Mustang were searched illegally, and the show-up that included him was unduly suggestive. Also, on account of these alleged violations, Seizys argues that the government should be barred from using all GPS tracking information.

Jones-Ross contends that the identification procedures used by police were impermissibly suggestive and the photo line-up shown to Officer Wiebers should be suppressed. Jones-Ross claims that the identification evidence is unreliable because Officer Wiebers had an inadequate opportunity to view the driver of the Oldsmobile. Jones-Ross also asserts that the reason he was placed in the photo line-up was based on statements made by Tamiko Jones. Jones-Ross asserts that Tamiko Jones was threatened by police into making statements regarding Jones-Ross's possession of the Oldsmobile.

Each of the alleged grounds for suppression will be discussed below.

4

### 1.      Search of the Vehicles

Seizys contends that the search of the Oldsmobile was unlawful.  Seizys argues that the search conducted prior to the vehicle being towed to the Impound Lot exceeded the scope of a mere "inventory" search, as evidenced by the presence of crime-lab technicians on the scene.

As stated at the evidentiary hearing held on this matter, Seizys's motion to suppress evidence obtained from the Oldsmobile is denied.[1]  "An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."  *U.S. v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (quotation omitted).  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally.  *Id*. at 529-530 (quotation omitted).  Seizys has not shown that he had an expectation of privacy or an ownership interest in the vehicle that was registered to Tamiko Jones and, as a mere passenger in the vehicle, Seizys cannot claim a legitimate privacy interest.  *Id*. at 530.  Therefore, he lacks standing to challenge the search of the vehicle.

Likewise, Chaplain and Seizys lack standing to object to the search of the Mustang. The vehicle was registered to Edward Chaplain and the key to the vehicle was found in Defendant Dat's pocket.  There is no allegation that either Defendant Chaplain or Seizys had an ownership interest in the vehicle.  As the Court previously ruled at the hearing on this matter, neither Chaplain nor Seizys have standing to contest the search of the Mustang.

### 2.      Arrest

Chaplain and Seizys claim there was no probable cause for their arrest.  The Court disagrees.

---

[1] To the extent, if any, that Defendant Jones-Ross contends that the search of the Oldsmobile was unlawful, the Court specifically finds that he also lacks standing to raise the issue. Jones-Ross does not contend that he has any ownership interest in the vehicle, nor has he shown any reasonable expectation of privacy in the vehicle or its contents.

"Police may conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about to commit a crime." *U.S. v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010). Reasonable, articulable suspicion "requires less than probable cause of criminal activity, but the suspicion cannot be based on an inarticulate hunch." *Id*. "The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience." *Id*. "Various behaviors and circumstances can contribute to, or be sufficient to provide, reasonable, articulable suspicion," such as "unprovoked flight at the sight of an officer." *Id*. (citation omitted). "Also, a stop is typically justified when a suspect matches the description of a person involved in a disturbance near in time and location to the stop." *Id*.

On July 16, 2014, officers were dispatched to the area of the KFC where a robbery had just occurred. Within three minutes of hearing Officer Dempsey's radio call, Officers Frodyma and Petrick saw Chaplain, Seizys and Dat within four blocks of the KFC. These individuals generally matched the descriptions of the suspects. When the officers exited the vehicle and told the men to stop, Chaplain fled. Under the circumstances, there was clearly a reasonable, articulable suspicion to stop these individuals.

The totality of the circumstances also supports probable cause for arrest. The key to the Mustang was found in Dat's pocket. In the Mustang, there was a red bandana and gray sweatshirt. These items matched the description of clothing worn by the suspects during the robbery. Further, Seizys was later identified by two witnesses as one of the suspects and, as previously noted, Chaplain fled from the scene when approached by the officers. "Probable cause for an arrest exists when the totality of circumstances demonstrates that the arresting officer personally knows or has been reliably informed of sufficient facts to warrant a belief that a crime has been committed and that the person to be arrested committed it." *U.S. v. Reinholz*, 245 F.3d 765, 778 (8th Cir. 2001). The undersigned concludes that the police officers had probable cause to arrest Chaplain and Seizys.

### 3.  Identification Evidence (Photo Line-Up & Show-Up)

"The Supreme Court has long recognized that the Due Process clause affords a defendant the right to suppress identification testimony which is not trustworthy." *U.S. v.*

6

*Salais*, No. 8:05CR420, 2006 WL 1401675, at *4 (D. Neb. May 17, 2006). The Eighth Circuit has found that a two-part test should be employed to test the reliability of identification procedures. First, courts are to consider "whether the identification procedures were impermissibly suggestive." *U.S. v. Johnson*, 56 F.3d 947, 953 (8th Cir. 1995) (citation omitted). If the procedures are found to be impermissibly suggestive, courts are to look to "the totality of the circumstances to determine whether the suggestive procedures created a very substantial likelihood of irreparable misidentification." *Id*. (internal quotation omitted). In determining whether the suggestive procedures created a substantial likelihood of irreparable misidentification, courts consider "(1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description given by the witness; (4) the level of certainty demonstrated by the witness in making the identification; and (5) the length of time between the event and the identification." *Clark v. Caspari*, 274 F.3d 507, 511 (8th Cir. 2001).

Jones-Ross contends that the photo line-up was impermissibly suggestive. Jones-Ross also asserts that his identification stemmed from comments his mother made under duress. Having heard the testimony, the undersigned concludes that there is no credible evidence that the photo line-up was unduly suggestive or created a likelihood of irreparable misidentification. Officer Wiebers testified that he was able to clearly view the driver of the vehicle. The Court finds Officer Wiebers credible. Officer Wiebers was shown a line-up containing head shots of six-African-American men with short hair and facial features similar to Jones-Ross. He was able to positively identify Jones-Ross. Moreover, there is no credible evidence that any statements made by Tamiko Jones were made under duress or were otherwise involuntary.

Similarly, there is no evidence to support Seizys's argument that the show-up created a substantial likelihood of misidentification. Each witness who identified Seizys was behind the counter at the KFC when it was robbed and had a good opportunity to view the suspects. The witnesses were able to give detailed descriptions of each suspect. Booth expressed that he was absolutely certain that Seizys was one of the robbers. Moreover, the length of time between the robbery and the show-up was relatively short. The robbery occurred at approximately 6:58 p.m. and the show-up began at 8:53 p.m.

####     4.       GPS Evidence

Seizys claims that the analysis of the GPS tracker assigned to him should be suppressed on account of the illegality of arrest, identification procedures and vehicle searches. The Court rejects this argument. There has been no showing that Seizys was arrested without probable cause, or that the identification procedures were suggestive to the degree to taint the witnesses' identification. Moreover, Seizys has cited no authority supporting the position that GPS tracking information should be suppressed when it is checked after a suspect is identified.

**IT IS HEREBY RECOMMENDED** to Chief District Court Judge Laurie Smith Camp that Defendants' motions to suppress (filings 80, 83 & 89) be denied in their entireties.

A party may object to a magistrate judge's order by filing an objection within fourteen (14) days after being served with a copy of the findings and recommendation. Failure to timely object may constitute a waiver of any objection.

**DATED August 10, 2015.**

**BY THE COURT:**

**S/ F.A. Gossett**
**United States Magistrate Judge**