IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiffs,<br><br>  vs.<br><br>SHANE SEIZYS, EMMANUEL CHAPLAIN, DILANG DAT, AND THOMAS JONES-ROSS,<br><br>    Defendants. | 8:14CR409<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Findings and Recommendation (Filing No. 145) and Supplemental Findings and Recommendation (Filing No. 160), issued by Magistrate Judge F.A. Gossett recommending that the Motions to Suppress filed by the Defendants, Emmanuel Chaplain ("Chaplain") (Filing No. 80), Shane Seizys ("Seizys") (Filing No. 83), and Thomas Jones-Ross ("Jones-Ross") (Filing Nos. 74 and 89), respectively, be denied. Seizys (Filing No. 147) and Chaplain (Filing No. 149) filed Objections to the Findings and Recommendation as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a). The Government responded (Filing No. 153) to the Objections, incorporating its previously filed briefs in opposition to the Motions to Suppress (Filing Nos. 131 and 144). For the reasons set forth below, the Findings and Recommendation and Supplemental Findings and Recommendation will be adopted, and the Motions to Suppress will be denied. Also before the Court is the Objection to Magistrate Judge's Order (Filing No. 129), filed by Defendant Dilang Dat ("Dat"). For the reasons discussed below, the Objection will be overruled.

**BACKGROUND**

Chaplain and Seizys do not formally object to the Magistrate Judge's factual findings nor is there any indication that the Magistrate Judge''s factual findings were erroneous. The Court adopts Judge Gossett's factual findings and provides the following by way of summary:

On June 23, 2014, the Kum & Go convenience store located at 1010 South 154th Street in Omaha, Nebraska, was robbed. Witnesses to the robbery described the suspects as two, dark-skinned black males with handguns. Witnesses also indicated that the suspects wore dark hooded sweatshirts and one suspect had a bandana over his face. The suspects were seen leaving in a silver or white sedan.

A few minutes after the Kum & Go was robbed, police were dispatched to the area of 90th and Maple Streets in Omaha to respond to a silver Oldsmobile Aurora (the "Oldsmobile") that had stalled in traffic. Although no occupants of the vehicle were present when police arrived at the scene, Officer Chad Wiebers had seen the Oldsmobile earlier while on his way to another call. At that time, Officer Wiebers observed several occupants of the vehicle and made eye contact with the driver.

Law enforcement discovered that the Oldsmobile was registered to Tamiko Jones, Defendant Jones-Ross's mother. Police interviewed Tamiko Jones who informed officers that Jones-Ross was previously in possession of the vehicle. A photo lineup that included Jones-Ross's picture was shown to Officer Wiebers. The line-up included photographs of six black males, with features similar to those of Jones-Ross. Officer Wiebers identified Jones-Ross as the driver of the Oldsmobile.

On July 16, 2014, the GameStop located at 9959 Redick Circle in Omaha was robbed. Video games were taken in that robbery. Approximately twenty minutes later, the Kentucky Fried Chicken ("KFC") located at 7601 North 30th Street in Omaha was robbed. Omaha Police Officer Patrick Dempsey received a call to respond to the scene of the robbery at 6:58 p.m. Officer Dempsey testified that he arrived on the scene less than 45 seconds after the call. Upon arrival, a KFC employee told Officer Dempsey that the restaurant had just been robbed by two black males, and that they had run eastbound. At that moment, Officer Dempsey dispatched through radio that two black males had robbed the KFC and ran eastbound. The employee then stated that the suspects ran eastbound to a white Ford Mustang (the "Mustang") parked approximately one block away from the KFC, changed shirts near the vehicle, and continued to run eastbound. Officer Dempsey testified that upon arriving to the area where the Mustang was parked, he was approached by an individual who stated that the suspects walked eastbound and possibly southbound. Officer Dempsey transmitted this additional information over his police radio.

Officer Chad Frodyma and his partner, Officer Petrick, heard Officer Dempsey's radio call. Officer Frodyma testified that he recalled hearing over the radio that three black males, two of whom appeared to be of Sudanese descent and two of whom were wearing white t-shirts, ran from the area. Officer Dempsey does not recall providing a description of the suspects' particular complexion, height, weight, or clothing over the radio.

Officer Frodyma and Officer Petrick arrived to the area surrounding the KFC approximately one minute to one-and-a-half minutes after Dempsey's radio call. Officer

Frodyma then heard a second radio call indicating that a witness saw the parties leave a car parked on 29th Street and head east and to the south. Officers Frodyma and Petrick then drove toward that area. Approximately three to four blocks away from the KFC, Officers Frodyma and Petrick observed three black males, two of whom appeared to be of Sudanese descent and one of whom was wearing a white t-shirt. Officer Frodyma testified that he observed the individuals within three minutes of the time the initial call came out.

As soon as Officer Frodyma opened the door to exit his cruiser, one of the black males fled the area on foot. The fleeing male was later identified as Chaplain. Officer Frodyma then drew his weapon, ordered the remaining two black males to the ground. These individuals were later identified as Dat and Seizys. Chaplain was detained a short time thereafter. Officers conducted a pat down of both Dat and Seizys. In Dat's pocket, officers located a little over $200 in cash, mostly crumbled up, as well as a key that matched the Mustang. On Seizys, officers found over $200 in cash, some of which was crumbled up.

Law enforcement then administered a "show-up" identification process. Chaplain, Dat, and Seizys were transported to the KFC parking lot and placed in separate police cruisers. One at a time, each suspect—cuffed and accompanied by armed officers—stepped out of a police cruiser, and was presented to each individual witness for identification.

Two witnesses who were behind the counter when the robbery occurred, William Booth ("Booth") and Audrey Chaney ("Chaney"), positively identified Seizys as a participant in the robbery. Chaney had previously described the first suspect as a dark-

4

skinned black male, six feet tall, with a dark hooded sweatshirt and lighter colored pants. She described the second suspect as a lighter-skinned black male, with a red bandana, gray sweatshirt and dark jeans. Booth described one suspect as wearing a red bandana with a gray hooded sweatshirt, light skinned, in his mid-20's. He described another suspect as being a dark-skinned black man, six feet tall, slim build, wearing a blue bandana and white pants. When Seizys presented to Booth for identification, Booth said he was certain that Seizys was one of the robbers. Three other witnesses who participated in the show-up were unable to identify anyone.

Police Sergeant Russell Petersen also responded to the scene of the KFC robbery and spoke to employees. Sergeant Petersen testified that he was told by witnesses that some of the suspects were wearing gray sweatshirts and at least one had a red bandana. Sergeant Petersen stated that, without entering, he looked into the Mustang and could see a gray sweatshirt, red bandana and video games in plain view.

Law enforcement searched the Mustang following the arrest, and before the vehicle was towed to the Omaha Police Impound Lot. From this search, law enforcement seized clothing and video games. Seizys's identification card was also found in the vehicle.

Police also found a fictitious license plate taped to the rear of the Mustang. It covered a plate belonging to Edward Chaplain, Defendant Chaplain's brother. The following day, police asked Edward Chaplain for permission to search the Mustang. Edward Chaplain denied consent. Consequently, the police obtained a search warrant. The application for the search warrant did not disclose to the issuing judge that police searched the vehicle at the scene.

After Seizys was arrested, further investigation led officers to discover that he was on parole. As part of that parole, he was wearing an electronic tracker on his ankle. This device tracked to multiple locations, including the Kum & Go convenience store on June 23, 2014. This evidence, along with Seizys's blue sweatshirt found in the Oldsmobile, connected Seizys to the Kum & Go, Game Stop, and KFC locations for each of the robberies.

Defendants Chaplain, Dat, Jones-Ross, and Seizys were charged together in a multi-count indictment.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(C), the Court must make a de novo determination of those portions of the findings and recommendation to which the Defendants have objected. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings or recommendation. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

## DISCUSSION

I.   **Standing to Object to Search of an Automobile**

Chaplain moves to suppress all evidence obtained from the Mustang on the basis that the search of the Mustang was improper, that there was no probable cause prior to obtaining a search warrant to search the vehicle, and that there was no probable cause for his arrest. Seizys moves to suppress evidence obtained from both the Mustang and the Oldsmobile, alleging the searches of both vehicles were illegal. The Magistrate concluded that Chaplain and Seizys lacked standing to challenge the search of the Oldsmobile and Mustang.

"To contest the validity of a search, a person must have a reasonable expectation of privacy in the place searched." *United States v. Turner*, 781 F.3d 374, 382 (8th Cir. 2015) *cert. denied,* No. 15-5230, 2015 WL 4388193 (U.S. Oct. 5, 2015) (quoting *United States v. Randolph,* 628 F.3d 1022, 1026 (8th Cir. 2011)). "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." *United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir.) *cert. denied sub nom. Powell v. United States*, 135 S. Ct. 2390 (2015) and *cert. denied,* 135 S. Ct. 2827 (2015) (quoting *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir. 1994)). To prove a cognizable privacy interest, a person "must show that (1) he 'has a reasonable expectation of privacy in the areas searched or the items seized,' and (2) 'society is prepared to accept the expectation of privacy as objectively reasonable.'" *United States v. Wheelock*, 772 F.3d 825, 828 (8th Cir. 2014) (quoting *United States v. James,* 534 F.3d 868, 872–73 (8th Cir. 2008)). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004) (quoting *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir. 1994)). The Eighth Circuit has noted that

> Factors relevant to the determination of standing include the following: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (quoting *Gomez*, 16 F.3d at 256).

Although Chaplain and Seizys both claim ownership in items discovered in the vehicles, neither Defendant claims ownership of the vehicles, and neither has demonstrated a reasonable expectation of privacy in the vehicles at issue. Fourth Amendment rights are personal and cannot be vicariously asserted; thus, a mere passenger has no reasonable expectation of privacy in an automobile belonging to another. *Rakas v. Illinois*, 439 U.S. 128, 138-44 (1978). Chaplain argues that he was not a mere passenger, but that he had a sufficiently close connection to the Mustang. To support this argument, Chaplain points to law enforcement's knowledge of what the suspects wore at the time of the robbery, and to the subsequent identification of this clothing when looking through the Mustang's window. This fact does not establish a sufficiently close relationship to the Mustang. Chaplain does not argue that he was the driver of the vehicle. Moreover, the present record lacks evidence establishing whether Chaplain had his brother's permission to use the Mustang, how long he had possession of the car, and whether he maintained sole possession of the vehicle on the day of the robbery. In fact, the key to the Mustang was found in Defendant Dat's pocket, suggesting that Chaplain did not maintain sole possession of the Mustang. The mere act of storing one's personal property in a vehicle is insufficient to demonstrate a close relation to the vehicle. *See Gomez*, 16 F.3d at 256. Chaplain has not met his burden of proof, and has no standing to challenge the legality of the search.

Seizys does not allege that he was more than a passenger, but argues that he had standing to challenge the search as a passenger. In support of this argument, Seizys argues the Supreme Court's holding in *Brendlin v. California*, 551 U.S. 249 (2007) applies to this case. In *Brendlin*, the Court held that a passenger seized for

8

Fourth Amendment purposes during a traffic stop may challenge the stop of a vehicle. *Id.* at 255, 259. However, the Eighth Circuit has declined to extend *Brendlin* to grant standing to mere passengers to challenge the *search* of a vehicle. *See U.S. v. Crippen*, 627 F.3d 1056, 1063 (8th Cir. 2010); *U.S. v. Spotted Elk*, 548 F.3d 641, 657 (8th Cir. 2008). Seizys attempts to distinguish this case from *Crippen* and *Spotted Elk* by arguing that the defendants in both cases did not claim ownership of the items seized in the vehicles. In other words, Seizys argues that he had a reasonable expectation of privacy in the vehicles because he left his property in them. Seizys provides no legal support for his argument that a defendant can establish a privacy interest merely by leaving personal property in a vehicle. As noted above, Seizys cannot claim a legitimate privacy interest merely because his personal effects were found in the vehicles searched. *See Barragan*, 379 F.3d at 530; *see also Gomez*, 16 F.3d at 256. Accordingly, Chaplain and Seizys have failed to demonstrate a sufficiently close connection to the vehicles searched and lack standing to challenge the search.

**II.     Probable Cause to Arrest**

Chaplain and Seizys argue that their arrests were not supported by probable cause. The Court first notes that officers were justified in stopping Dat, Chaplain and Seizys. Police may conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about to commit a crime. *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (citing *Terry v. Ohio,* 392 U.S. 1, 21, (1968)). A *Terry* stop may not be based on an "inarticulate hunch" but requires reasonable, articulable suspicion, which is less than probable cause. *Id.* (citing *Terry,* 392 U.S. at 22). Reasonable, articulable suspicion may arise, for example, where a

9

suspect flees, unprovoked, at the sight of an officer or "when a suspect matches the description of a person involved in a disturbance near in time and location to the stop." *Id.*

In this case, Dat, Seizys, and Chaplain matched the descriptions given to police and were spotted within a few blocks of the robbery very shortly after the robbery occurred. *See id.* Although officers' testimony regarding the descriptions of the suspects differed, the arresting officers received reports that multiple black males robbed the KFC and ran eastbound and possibly southbound. (Tr. 42, 62.) The arresting officer testified that he relied on information that three males had fled the scene of the robbery, two were of Sudanese descent, and two were wearing white shirts. (Tr. 62.) When officers stopped and approached Dat, Chaplain, and Seizys, Chaplain fled. At that point, Seizys and Dat were ordered to the ground. Officers completed a pat-down search of Dat and Seizys and officers eventually apprehended Chaplain. All of this occurred within four blocks of the KFC and within three minutes of the initial call. Based on the totality of these facts, the officers were justified in an initial stop.

As a result of the *Terry* stop, officers obtained information supporting probable cause to arrest the Chaplain, Seizys, and Dat. Probable cause for an arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime. *United States v. Roberts*, 787 F.3d 1204, 1210 (8th Cir. 2015). A probability or substantial chance of criminal activity, rather than an actual showing of criminal activity is sufficient. *United States v. Torres–Lona*, 491 F.3d 750, 756 (8th Cir. 2007). In determining whether officers had probable cause for an arrest, courts look to the events

10

leading up to the arrest to conclude whether the historical facts, viewed from the standpoint of an objectively reasonable police officer, constitute probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

In addition to the description of the suspects and Chaplain's flight at the sight of law enforcement, officers discovered evidence to support probable cause to arrest the suspects. For example, during the pat down of Seizys and Dat, officers located over $200 in cash on each of them, some of which was crumpled in their pockets. Officers testified that this finding was significant because when money is taken in a robbery, it is often crumpled when quickly shoved into pockets. Also, officers located the key to the Mustang on Dat. Thus, officers could tie Dat, and by association, Seizys, and Chaplain to the Mustang. Witnesses had told officers that the suspects changed their clothes near the Mustang. Considering the totality of the circumstances, an objectively reasonable officer would have probable cause to arrest the Defendants.

### III. Show-Up Identification

Seizys argues that the Magistrate erred because the show-up was impermissibly suggestive and created a substantial likelihood of misidentification. Seizys relied on the Eighth Circuit's decision in *Clark v. Caspari*, 274 F.3d 507, 511 (8th Cir. 2001). In *Clark*, the court concluded that a show-up was improperly suggestive when the suspects were the only individuals presented to the witnesses and, at the time of the show-up, the black suspects were surrounded by white officers, one of whom was holding a shot gun. *Id*. The Eighth Circuit explained that under these circumstances, the witnesses

> . . . may have felt obligated to positively identify [the suspects], so as not to disagree with the police, whose actions exhibited their belief that they had apprehended the correct suspects. Essentially, [the witnesses] were

11

> given a choice: identify the apprehended suspects, or nobody at all. This coercive scenario increased the possibility of misidentification.

*Id.*

Seizys argues that the significant police presence and the fact that only the suspects were presented to witnesses at the KFC demonstrates the same increased possibility of misidentification. However, the Eighth Circuit has held "[a]bsent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." *United States v. Pickar*, 616 F.3d 821, 828 (8th Cir. 2010) (quoting *United States v. King,* 148 F.3d 968, 970 (8th Cir.1998)). In *Pickar*, law enforcement conducted a show-up in which the suspect was handcuffed and standing between two officers in front of a marked police cruiser, with one of the officers shining a small flashlight in the defendant's face. *Id*. The Eighth Circuit held this procedure was not unduly suggestive, reasoning that the facts could be distinguished from those in *Clark*. *Id*. The court explained that the procedure used in *Pickar* was "materially less suggestive" than that used in *Clark,* and was therefore not unduly suggestive for purposes of due process analysis. *Id.*; *see also United States v. Martinez,* 462 F.3d 903, 910 (8th Cir. 2006) ("Necessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive.").

The show-up in this case occurred a short time after the robbery and at the scene of the robbery. Although the police presence was significant, there is no evidence of aggression or threat to the suspects as was present in *Clark*. All officers at the scene carried firearms which were visible and all suspects were handcuffed behind their

backs. The individual suspects were escorted by officers to within 15 to 20 feet of the vehicle occupied by the witness, directed to face the witness, and then rotated in a 360 degree fashion. Witnesses would be able to tell that each of the suspects was in police custody. While the police presence was obvious, the only significant difference between this case and *Pickar* is that the suspects were ordered to turn around while in *Pickar* the officers shined a flashlight in the suspects' faces. Accordingly, there is no indication that, under the circumstances, this method was as unduly suggestive as the procedure police used in *Clark*.

Even if the procedure of the show-up increased the possibility of misidentification, this would not end the inquiry. The Eighth Circuit in *Clark* stated that even if the identification procedures gave "cause for concern," the witnesses' "identifications may nonetheless be admissible, as long as they are reliable. Reliability 'is the linchpin in determining the admissibility of identification testimony.'" *Id.* (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114 (1977)). "In assessing reliability, [courts] consider such factors as the opportunity of the witness to view the suspect during the commission of the crime; the witness's degree of attention; the accuracy of the witness's prior description of the suspect; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation." *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996) (citing *Neil v. Biggers,* 409 U.S. 188, 199–200 (1972)). In *Clark*, even though the show-up procedure was coercive, the Eighth Circuit held the identifications were nevertheless admissible because the witnesses had an opportunity to view the perpetrators clearly; only a short

time elapsed between the crime and the show-up; and there was no evidence that the police prompted the witnesses to identify the suspects. 247 F.3d at 512.

In this case, both witnesses were behind the counter at the KFC when it was robbed and had an opportunity to clearly view the perpetrators at the time of the robbery. Their degree of attention was supported by the descriptions they provided to police. Booth described one of the suspects as a black male, with a red bandana, gray hooded sweatshirt, five feet eleven inches to six feet tall, light skinned in his mid-20s. Chaney described the same suspect as a black male, with a red bandana, gray sweatshirt, five feet ten inches tall, 160 pounds in weight, and light skinned. Their descriptions matched Seizys. Seizys is a light-skinned, black male, six feet one inch in height, 160 pounds in weight, and 22 years old. Further, the search of the Mustang revealed two gray hooded sweatshirts and a red bandana. Both witnesses also demonstrated a high level of certainty with respect to their identification of Seizys. Finally, the show-up took place a relatively short time after the robbery. Considering these factors together, the Magistrate did not err in concluding that the identification evidence was admissible.

**IV.  GPS Evidence**

Seizys also argues that evidence taken from the GPS tracking device worn by Seizys was improperly obtained. Seizys argues that the GPS tracking evidence was obtained as a result of the illegal arrest and improper show-up. Seizys's argument fails because the Court concludes that Seizys's arrest was supported by probable cause and the identification testimony was not unreliable. Accordingly, the Magistrate did not err in concluding that the GPS tracking evidence need not be suppressed.

## V. Jones-Ross's Motions to Suppress

Jones-Ross filed two Motions to Suppress (Filing No. 74 and 89). Regarding Filing No. 89, Jones-Ross did not object to the Magistrate's Findings and Recommendation. Having conducted a de novo review, the Court concludes that the Magistrate's Findings and Recommendation (Filing No. 145) with respect to Jones-Ross will be adopted.

On October 7, 2015, the Magistrate issued a Supplemental Findings and Recommendation (Filing No. 160), noting that the Magistrate inadvertently omitted reference to Jones-Ross's Motion to Suppress at Filing No. 74. The Court's review of the record shows that Jones-Ross failed to file a brief in support of his Motion at Filing No. 74 as required by NECrimR 12.3(a)(1). Further, Jones-Ross had an opportunity to be heard on his Motion but did not raise the issue at the evidentiary hearing. Accordingly, the Court considers Filing No. 74 as abandoned pursuant to NECrimR 12.3(a)(1), and the Supplemental Findings and Recommendation (Filing No. 160) will be adopted.

## VI. Motion to Sever

Dat argues that the Magistrate erred in denying his Motion to Sever because potential evidence and charges against Seizys and Chaplain may prejudice the jury against Dat. Federal Rule of Criminal Procedure 8(a) "allows a single indictment to charge a defendant with multiple offenses only if the offenses are of the same or similar character, based on the same act or transaction, or are parts of a common scheme or plan." *United States v. Steele*, 550 F.3d 693, 702 (8th Cir. 2008). "This rule is interpreted broadly in favor of joinder." *Id.* Where charges are properly joined under

Rule 8, Federal Rule of Criminal Procedure 14 provides the court discretion to "order separate trials of counts" when the "joinder of offenses . . . in an indictment . . . appears to prejudice a defendant." Fed.R.Crim.P. 14(a). The prejudice a defendant would face must be "severe or compelling." *United States v. Kirk,* 528 F.3d 1102, 1108 (8th Cir. 2008) (citation and marks omitted); *see also United States v. Young*, 701 F.3d 1235, 1238 (8th Cir. 2012) (stating that [w]hether to sever a trial is a question left to the district court's discretion and we "will not reverse unless the defendant shows an abuse of discretion resulting in severe prejudice."). "Severe prejudice 'occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that [the defendant] would have had in a severed trial.'" *Young*, 701 F.3d at 1238 (quoting *United States v. Taken Alive, Jr.,* 513 F.3d 899, 902 (8th Cir. 2008)). "[T]here is a strong presumption against severing properly joined counts." *United States v. Garrett*, 648 F.3d 618, 626 (8th Cir. 2011) (quoting *United States v. McCarther,* 596 F.3d 438, 442 (8th Cir.2010)). The defendant bears the burden of establishing severe prejudice. *Id.*

Dat does not argue that the charges were improperly joined under Rule 8, and he has not demonstrated sufficient prejudice to merit severance in this case. He argues that felon-in-possession-of-a-firearm charges against his co-defendants may serve as a conduit through which Dat's prior convictions may be revealed, though he was not charged with being a felon in possession of a firearm. However, Dat offers no evidence or indication of how his prior convictions or bad acts may be introduced. Further, "[s]everance is not required merely because evidence which is admissible only against some defendants may be damaging to others." *United States v. Casteel*, 663 F.3d 1013, 1019 (8th Cir. 2011) (quoting *United States v. Delpit,* 94 F.3d 1134, 1143 (8th

Cir.1996)). "The Supreme Court has made it clear that the risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions . . . ." *Id.* Dat failed to demonstrate that any prejudice he may suffer is "substantial enough to outweigh the general efficiency of joinder." *Id.* (internal quotation and marks omitted). Accordingly, the Magistrate did not err in denying Dat's Motion to Sever.

## CONCLUSION

For the reasons discussed, the Findings and Recommendation will be adopted; the Motions to Suppress will be denied; and Dat's Objection to the Magistrate's Order (Filing No. 129) will be overruled.

IT IS ORDERED:

1. The Findings and Recommendation (Filing No. 145) and Supplemental Findings and Recommendation (Filing No. 160), issued by Magistrate Judge F.A. Gossett are adopted in their entirety;

2. The Motions to Suppress filed by the Defendants Emmanuel Chaplain (Filing No. 80), Shane Seizys (Filing No. 83), and Thomas Jones-Ross (Filing Nos. 74 and 89) are denied;

3. The Objections to the Magistrate's Order filed by Shane Seizys (Filing No. 147) and Emmanuel Chaplain (Filing No. 149) are overruled;

4. The Clerk of Court is directed to terminate the Response to Objection to Findings and Recommendation (Filing No. 153); and

5. The Objection to Magistrate Judge's Order (Filing No. 129), filed by Defendant Dilang Dat is overruled.

Dated this 8th day of October, 2015

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge